**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**HAROLD E. BISHOP,**
**PATRICIA BISHOP**
**and ALTERNATIVE HEALTH INC.**

      Plaintiffs,

      **v.**                                                  **05cv0827**

**GNC FRANCHISING LLC, GENERAL**
**NUTRITION CORP., GENERAL**
**NUTRITION DISTRIBUTION CORP.,**
**and APOLLO MANAGEMENT LP**

      Defendants.


**MEMORANDUM OPINION**

**December 1, 2005**


**I. Introduction**

Defendants have filed a motion to dismiss (document no. 9) all counts of plaintiffs' first amended complaint. After careful consideration of defendants' motion and plaintiffs' response, and their respective memoranda of law, this Court will grant in part and deny in part defendants' motion to dismiss.


**II. Statement of Facts**

According to their amended complaint, plaintiffs Harold E. Bishop, Patricia Bishop and Alternative Health, Inc., own and operate two franchises under franchise agreements with GNC Franchising LLC, General Nutrition Corporation, and General Nutrition Distribution Corporation, (collectively, "GNC"). Plaintiffs allege that GNC uses and manipulates its

franchise system unfairly and unlawfully to benefit its company-owned stores which compete directly with plaintiffs' and other franchisees' non-company stores.

The Bishops signed two franchise agreements with GNC. On November 20, 1997 and November 21, 1997, GNC granted the Bishops the right to operate GNC stores in West Lafayette, Indiana and Kokomo, Indiana, respectively. The Bishops assigned their franchise rights in the West Lafayette store to Alternative Health, Inc. on December 9, 1999. Plaintiffs' first amended complaint sets forth various federal statutory causes of action, and Indiana statutory and common law causes of action, based on predatory marketing, pricing, and other unfair trade practices.

### III. Standards

In deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court accepts the well-pleaded factual allegations of the complaint as true, and draws all reasonable inferences therefrom in favor of the plaintiff. *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital*, 185 F.3d 154, 155 (3d. Cir. 1999). A claim should not be dismissed for failure to state a claim unless it appears beyond a doubt that the non-moving party can prove no set of facts in support of its allegations which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Marshall-Silver Construction Co. v. Mendel*, 894 F.2d 593, 595 (3d. Cir. 1990).

In making this determination, the court must construe the pleading in the light most favorable to the non-moving party. *Budinsky v. Pennsylvania Dept. of Environmental Resources*, 819 F.2d 418, 421 (3d. Cir. 1987). Further, the Federal Rules of Civil Procedure require notice pleading, not fact pleading, so to withstand a Rule 12(b)(6) motion, the plaintiff "need only

make out a claim upon which relief can be granted. If more facts are necessary to resolve or clarify the disputed issues, the parties may avail themselves of the civil discovery mechanisms under the Federal Rules." *Alston v. Parker*, 363 F.3d 229, 233 n.6 (3d Cir. 2004), *quoting Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 512 (2002) ("This simplified notice pleading standard relies on liberal discovery rules . . . to define facts and issues and to dispose of unmeritorious claims.").

## IV. Discussion

### Choice of Law: Counts II, III, VIII, and IX

At the threshold, the Court must determine whether Indiana or Pennsylvania law governs the franchise agreements and operations in this case. The agreements provide that, unless any provision would not be enforceable outside of Pennsylvania, the agreement "shall be interpreted and construed under the laws of the Commonwealth of Pennsylvania, which laws shall prevail in the event of any conflict of law . . . ." Franchise Agreement, ¶ XXXVI (A), Defendants' App. at 51-52, 108-09.

Where, as here, jurisdiction is based upon diversity, a federal court should apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Kruzits v. Okuma Machine Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994). Under Pennsylvania law, "courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Id.*

Pennsylvania courts have adopted section 187 of the Restatement, Second, Conflict of Laws, which honors choice of law clauses unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no reasonable basis for the parties'

choice, or (b) application of the law of the chosen state would be contrary to a fundamental

policy of a state which has a materially greater interest than the chosen state in the determination

of the particular issue. Restatement (Second) of Conflict of Laws § 187 (1971). Pennsylvania

courts have traditionally held that a choice of law provision in a contract will be upheld as long

as the transaction bears a "reasonable relationship to the state whose law is governing." *Novus*

*Franchising Inc. v. Taylor*, 795 F. Supp. 122, 126 (M.D. Pa. 1992) (*citing Churchill Corp. v.*

*Third Century, Inc.*, 396 Pa. Super. 314, 578 A.2d 532, 537 (1990), *app. Denied*, 527 Pa. 628,

592 A.2d 1296 (1991)); *Instrumentation Assoc. Inc. v. Madsen Elecs. Ltd.*, 859 F.2d 4, 5-6 (3d

Cir. 1988). Thus, Pennsylvania courts will uphold contractual choice-of-law provisions where

the parties have sufficient contacts with the chosen state. *Jaskey Fin. and Leasing v. Display*

*Data Corp.*, 564 F. Supp. 160 (E.D. Pa 1983). In *Kruzits*, the United States Court of Appeals for

the Third Circuit stated: "Pennsylvania courts will only ignore a contractual choice of law

provision if that provision conflicts with strong public policy interests." 40 F.3d at 56.

Here, Pennsylvania has a substantial relationship to the parties, and plaintiffs do not

argue to the contrary: the GNC defendants are Pennsylvania corporations with their principal

place of business in Pennsylvania, and these Pennsylvania defendants have an interest in

uniformity in dealings with their franchisees who are scattered in numerous states throughout the

country.

Plaintiffs argue that application of Pennsylvania law would be contrary to some

unidentified fundamental policy of Indiana that would otherwise protect them. In support,

plaintiffs rely primarily on *Stone St. Servs. v. Daniels*, 2000 U.S. Dist. LEXIS 18904 (E.D. Pa.

2000), which held that application of Pennsylvania law to the contract in that case would be

contrary to the fundamental consumer protection laws of Kansas. It should be obvious that the

4

choice of laws analysis between the respective consumer laws of Kansas versus those of Pennsylvania is not germane to the choice of laws analysis as between the respective laws of Indiana versus Pennsylvania. Plaintiffs do not even *attempt*: (i) to articulate the difference between the consumer protection statutes of the two states; (ii) to identify any public policies of Indiana that would be defeated by application of Pennsylvania laws; or (iii) to suggest how plaintiffs might fare better under the laws of Indiana than those of Pennsylvania. Accordingly, the Court sees no reason to disturb the parties' contractual choice of law, and holds that, because all of the claims herein arise from operation of the franchise agreements, the state claims will be governed by the laws of the Commonwealth of Pennsylvania and, therefore, counts II, III, VIII and IX will be dismissed with prejudice.


**Count I: Breach of Contract**

Three elements are necessary to properly plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *J.F. Walker Co., Inc. v. Excalibur Oil Group*, 792 A.2d 1269, 1272 (Pa. Super. 2002). The contracts at issue are the franchise agreements. Plaintiffs identify several franchise agreement provisions that GNC allegedly breached: Section III.E., which requires GNC to "seek to maintain high standards of quality, appearance, and service of the System . . ."; Section III.G., which obligated GNC to comply, *inter alia*, with the procedures in the Operations Manual, including the procedures regarding the approval of third-party products; and Section 1.D, in which GNC purports to retain certain rights to compete with Bishop, a set of rights that does not include the right to use Bishop's customer lists.

Viewed in light of the liberal pleading standards of Rule 12(b)(6), this Court simply cannot say, at this early stage in the proceedings, that plaintiffs will be able to state no set of facts in support of the breach of contract claim. Accordingly, defendants' motion to dismiss this claim will be denied.

## Counts IV (Fraud) and V (Negligent Misrepresentation)

Plaintiffs allege that GNC, by failing to disclose the alleged predatory pricing and marketing schemes in its Uniform Franchise Offering Circular ("UFOC"), committed fraud and negligent misrepresentation that induced plaintiffs to enter into the franchise agreements. This Court holds, however, that the "gist of the action" doctrine bars these tort claims.

The "gist of the action" rule has not been addressed by the Supreme Court of Pennsylvania, but the United States Court of Appeals for the Third Circuit recently stated: "[W]e predict that the state supreme court would adopt the doctrine as set out in the Superior Court's cases." *Williams v. Hilton Group PLC*, 93 Fed. Appx. 384, 385 (3d Cir. 2004). The primary case cited by the Third Circuit is *Etoll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10 (Pa. Super. Ct. 2002), in which the Pennsylvania Superior Court stated that the "gist of the action" doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims by precluding plaintiffs from recasting ordinary breach of contract claims into tort claims." *Id*. at 14. The Superior Court explicated the difference between contract and tort claims as follows: "Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals." *Id*. The *Etoll* Court found further that the "fraud at issue was not so tangential to the parties' relationship so as to make fraud the gist of the action." *Id*. at 21.

6

Rather, the Court stated, the fraud claims were so "inextricably intertwined with the contract claims" that they were barred as a matter of law from being raised independently. *Id*.

Torts arising from the inducement to *enter into* contract are within the scope of the "gist of the action" doctrine. *See Williams v. Hilton Group PLC*, 93 Fed. Appx. 384. In *Hilton Group*, the Court of Appeals for the Third Circuit applied the "gist of the action" doctrine to bar tort claims of fraudulent and negligent misrepresentation that arose from the negotiations leading to a written agreement, the *inducement* to sign a Letter of Intent. *Id*. at 386-87. In the case at bar, plaintiffs set forth in Counts IV (Fraud) and V (Negligent Misrepresentation) that false statements and omissions in the UFOC *induced* them into entering the franchise agreements with GNC. In support of their tort claims, plaintiffs aver that the UFOC and statements by GNC misrepresented: (1) the actual amount of franchisee training offered by GNC; (2) the freedom of franchisees to purchase from third party suppliers; (3) the amount of revenue and profit derived from franchisees by GNC; and (4) the unequal treatment of franchisees and company-owned GNC stores. Amended Complaint ¶ 23-27. Of these, (2)-(4) are mentioned in plaintiffs' breach of contract claim. Amended Complaint ¶ 36-40. These issues, therefore, "sound in contract," and the allegations of fraud and negligence are inextricably intertwined with plaintiffs' breach of contract claim (at Count I).

Adding the words "falsely" and "negligently" to the representations made in the course of *reaching* an agreement does not convert what is essentially a breach of contract action into a fraud or negligence claim. *See e.g., Galdieri v. Monsanto Co.*, 2002 U.S. Dist. LEXIS, 11391 at *34 (E.D. Pa. 2002) ("breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words '*fraudulently induced*' ") (emphasis added). The parties' obligations have been defined by the terms of the franchise agreements, not by "larger social politics

7

embodied in the law of torts." *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 104 (3d Cir. 2001), *quoting Bash v. Bell Telephone Co.*, 411 Pa.Super. 347, 601 A.2d 825, 830 (1992).

Applying the case law cited above to the facts at bar, this Court concludes that plaintiffs' tort claims at Count IV and V will be dismissed with prejudice.

## Count VI: Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs claim damages under an implied duty of good faith and fair dealing in relation to their written contracts with GNC. The implied duty of good faith raised by plaintiffs is a *contract*, not a tort claim, and therefore cannot fall under the "gist of the action" doctrine discussed hereinabove; Pennsylvania does not recognize a breach of good faith *tort* claim, at all. *See Plaum v. Jefferson Pilot Fin. Ins. Co.*, 2004 WL 2980415, at *6 (E.D. Pa. 2004) ("Pennsylvania does not, however, recognize a common law cause of action in tort for breach of the duty of good faith and fair dealing . . . ."); *Greater New York Mut. Ins. Co. v. N. River. Ins. Co.*, 872 F. Supp. 1403, 1409 (E.D. Pa. 1995) (same).

Section 205 of the Restatement (Second) of Contracts states that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (1981). While this covenant of good faith and fair dealing has been imposed in some contexts in Pennsylvania, "under Pennsylvania law, every contract does not imply a duty of good faith." *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 701 (3d Cir. 1993).

Plaintiffs allege that GNC violated the implied covenant of good faith by "utilizing unconscionable provisions in the agreement." Amended Complaint ¶ 83. The implied covenant

of good faith, however, cannot modify or override express contractual terms. *See Amoco Oil Co. v. Burns*, 437 A.2d 381, 384 (Pa. 1981) ("the duty of good faith and commercial reasonabless is used to define the franchisor's power to terminate the franchise only when it is not explicitly described in the parties' written agreements."); *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1226, 1227 (Pa. 1981) (implied duty of good faith "serves the valuable purpose of defining contractual relationships which have been left unexpressed by the parties"). Plaintiffs are therefore barred from raising this claim in relation to the terms of their franchise agreements.

Plaintiffs claim that GNC's conduct in *performing* the contract breached the implied covenant of good faith, but it is unclear whether such a claim is recognized under Pennsylvania law. The duty of good faith and fair dealing is limited to special types of contracts, involving special relationships between the parties. In the context of franchise agreements, a franchisor has a duty to act in good faith and with commercial reasonableness when *terminating* a franchise for reasons not explicit in the agreement. *Atlantic Richfield Co. v. Razumic*, 390 A.2d 736, 742 (Pa. 1978).

Defendants argue that termination of a franchise is the *only* situation in the franchise context where Pennsylvania law recognizes an implied covenant of good faith. Plaintiffs argue that a number of courts have since interpreted the holding in *Atlantic Richfield* to apply to franchise agreements more broadly. In *Creeger Brick & Bldg. Supply, Inc. v. Mid-State Bank & Trust Co.*, 385 Pa. Super. 30, 560 A.2d 151 (1989), the Pennsylvania Superior Court held that a lending institution had not breached any implied duty of good faith by negotiating terms favorable to it on a loan. In deciding the issue, the Court noted that an implied contractual duty of good faith had been recognized in limited situations and stated, "most notably a duty of good faith has been imposed upon franchisors *in their dealings* with franchisees." *Id*. at 35, 560 A.2d

9

at 153-54 (emphasis added). The District Court for the Eastern District of Pennsylvania interpreted the language in *Creeger* to mean that Pennsylvania law should recognize the implied duty of good faith within a larger scope in the franchise relationship, not only franchise termination: "In this light -- and given the breadth of the Restatement language, on which the Pennsylvania doctrine is based -- it seems unlikely that the Pennsylvania appellate courts will limit the franchisor's implied duty to deal in good faith to situations of franchise terminations when the issue is squarely presented." *AAMCO Transmissions Inc. v. Harris*, 759 F. Supp. 1141, 1148 (E.D. Pa. 1991). The Court in *AAMCO* also noted that *Atlantic Richfield* recognized an implied covenant in cases of franchise termination, but did not expressly limit the duty to that context. *Id*.

In sum, a handful of Pennsylvania courts have considered the *possibility* of expanding the good faith duty beyond the termination exception of *Atlantic Richfield*, but none has yet done so. In the absence of clear guidance from the Supreme Court of Pennsylvania or the Court of Appeals for the Third Circuit, this Court declines to extend the scope of duty. Accordingly, this claim will be dismissed under Rule 12(b)(6).

## Count VII: Predatory Pricing Under the Sherman Act

The elements of a monopolization claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, are: (1) the possession of monopoly power in the relevant market; and (2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing

competition in the long run. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 118 (1986). The United States Supreme Court has noted that "predatory pricing schemes are rarely tried, and even more rarely successful." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589 (1986). Because predatory pricing is so expensive (the predator loses money on every sale), it is not a realistic strategy for a firm that does not have an extremely large market share. *See Cargill v. Montfort of Colo.*, 479 U.S. at 119 n.15 (declaring 21% market share so low as to make predation unlikely).

Courts may dismiss Section 2 claims for failure to plead a valid relevant market. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) (affirming dismissal of Section 2 monopoly claims for failure to plead a relevant market), *cert denied*, 523 U.S. 1059 (1998). Here, plaintiffs have failed to plead that GNC possesses monopoly power in any relevant market, and this Court accordingly will dismiss the claim.

The outer boundaries of a relevant market are determined by reasonable interchangeability of use. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482 (1992); *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962); *Tunis Brothers Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively. A person needing transportation to work could accordingly buy a Ford or a Chevrolet automobile, or could elect to ride a horse or bicycle, assuming those options were feasible." *Allen-Myland, Inc. v. International Business Machines Corp.*, 33 F.3d 194, 206 (3d Cir. 1994) (internal quotations omitted). When assessing reasonable interchangeability, "factors to be considered include price, use, and qualities." *Tunis Brothers*, 952 F.2d at 722. Reasonable interchangeability is also

11

indicated by "crosselasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. at 325. Products in a relevant market are characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Tunis Brothers*, 952 F.2d at 722.

In *Queen City Pizza*, the Court of Appeals for the Third Circuit held that in a franchise context, the relevant market for purposes of Section 2 is defined by the reasonable interchangeability of goods, regardless of the purchasing restrictions in the franchise agreement. 124 F.3d at 438 ("A court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general. Thus, the relevant inquiry here is not whether a Domino's franchisee may reasonably use both approved or non-approved products interchangeably without triggering liability for breach of contract, but whether pizza makers in general might use such products interchangeably."). The relevant market in plaintiffs' case is therefore the market for *all* reasonably interchangeable health supplements, power bars, and energy drinks. Plaintiffs could only state a Section 2 claim by alleging that GNC possesses monopoly power in the market for all such goods.

Plaintiffs, in their Opposition to Defendants' Motion to Dismiss, have failed to argue their Section 2 claim at all, and because they identify neither a relevant market nor GNC's monopoly power in that market, fail to plead the prerequisites of a predatory pricing claim. Accordingly, this Court will dismiss the claim without prejudice.


**Count X: Robinson Patman Act**

12

The Robinson-Patman Act "prohibits price discrimination where the effect of such discrimination may be substantially to lessen competition or tend to create monopoly." *Crossroads Cogeneration v. Orange & Rockland*, 159 F.3d 129, 142 (3d Cir. 1998), *quoting* 15 U.S.C. § 13(a). To state a viable claim under the Robinson-Patman Act, a plaintiff must allege facts which demonstrate that: (1) the defendant made at least two contemporary sales of the same commodity at different prices to different purchasers; and (2) the effect of such discrimination was to injure competition." *Id*.

Plaintiffs allege that GNC engaged in discriminatory sales between franchises and GNC-owned stores (Amended Complaint ¶ 105). Certain jurisdictions have held that transfers between parent and wholly-owned subsidiaries, such as these, do not fall within the scope of the Robinson-Patman Act as a matter of law. *See Security Tire & Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962, 967 (5th Cir. 1979) ("transfers between parent and wholly-owned subsidiary are not the type of transactions the Robinson-Patman Act meant to regulate"), *cert denied*, 444 U.S. 942 (1979). The United States Supreme Court later held in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), that a parent and a wholly owned subsidiary are a single economic unit under the Sherman Act, and a number of Courts of Appeals have since construed the holding to apply to the Robinson-Patman Act, as well. *See Russ' Kwik Car Wash v. Marathon Petroleum Co.*, 772 F.2d 214, 221 (6th Cir. 1985) ("the parent and subsidiary are a single economic unit. The Robinson-Patman Act is not concerned with transfers between them"); *City of Mount Pleasant, Iowa v. Assoc. Elec. Co-Op. Inc.*, 838 F.2d 268, 278-79 (8th Cir. 1988) (following the Sixth Circuit in adopting the *Copperweld*-inspired rule, holding that the Robinson-Patman Act did not apply to sales between an electricity utility company and retail distribution electric cooperatives); *Caribe BMW, Inc. v. Bayerische Motoren Werke*

13

*Aktiengesellschaft*, 19 F.3d 745 (1st Cir. 1994) (acknowledging the application of the *Copperweld* doctrine by the Sixth and Eighth Circuits to transfers between a parent and its wholly-owned subsidiary, and, applying the doctrine, held that a parent and its wholly-owned subsidiary are one seller for Robinson-Patman Act purposes). The Ninth Circuit, on the contrary, has held that transactions with subsidiaries are not necessarily immune. *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870 (9th Cir. 1982), *cert. denied*, 460 U.S. 1085 (1983). The United States Court of Appeals for the Third Circuit has not spoken on this issue.

The United States Supreme Court has held unambiguously in *Copperweld* that a parent and wholly-owned subsidiary are considered a single economic unit for purposes of Section 1 the Sherman Act. 467 U.S. 752. It is, therefore, reasonable to consider them a single economic unit for purposes of the Robinson-Patman Act, and transfer of commodities between them insufficient to constitute a "sale" under the Act. GNC Corporation calculates the revenue of its wholly-owned GNC retail stores using the final purchase price paid by consumers. The revenue it reports from franchise operations, however, is a combination of franchise royalty revenue and wholesale product sales to franchisees. *See* GNC Corporation, Quarterly Report 24 (September 20, 2005).

In their Opposition to Defendant's Motion to Dismiss, plaintiffs make no argument as to the applicability of the Robinson-Patman applies other than citing a case from the Court of Appeals for the Ninth Circuit and two cases from the Federal District Courts of New York, none of which this Court finds to be persuasive. There being no other case law in this jurisdiction directly on point, we follow the decisions in the First, Fifth, Sixth, Eighth Circuits in holding that transfers between a parent and subsidiary, such as those between GNC and its wholly-owned

subsidiaries, do not fall within the scope of the Robinson-Patman Act. Accordingly, this Court will dismiss this claim with prejudice.

**Count XI: Sherman Act**

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. Although the language in Section 1 of the Sherman Act suggests a broad restriction on commercial restraints, the United States Supreme Court has repeatedly recognized that this provision covers only unreasonable restraints of trade. *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85 (1984). In determining whether a defendant's conduct unreasonably restrains trade, courts apply one of two modes of analysis. *Rossi v. Standard Roofing*, 156 F.3d 452, 461 (3d Cir. 1998). Courts apply per se analysis when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Bd. of Regents*, 468 U.S. at 100, (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979)). In a per se analysis, conduct that is "manifestly anticompetitive" is "conclusively presumed to unreasonably restrain competition without elaborate inquiry as to the precise harm it has caused or the business excuse for its use." *Rossi*, 156 F.3d at 461. If a court finds that a restraint is *not* per se unreasonable, the "rule of reason" analysis is applied.

Plaintiffs claim that GNC engaged in horizontal price-fixing with its suppliers, and that this alleged conduct constitutes per se unlawful conduct. Although plaintiffs originally alleged facts in support of both horizontal and vertical conspiracy (Amended Complaint ¶¶ 105, 117), plaintiffs emphasize in their Opposition to Defendants' Motion to Dismiss that their Sherman

Act claim alleges horizontal conspiracy only (doc. no. 12). In arguing that their claim is of the per se variety, however, plaintiffs cite only two modestly relevant cases, without analysis. *See Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158 (7th Cir. 1987); *Rochez Bros. v. North Am. Salt Co.*, 1994-2 Trade Cas. (CCH) Par.70,804 (W.D. Pa. 1994). This Court finds neither persuasive. Plaintiffs allege that GNC pressured third party vendors through the threat of boycott. While "group boycott" (a term never invoked by plaintiffs) is a standard Sherman Act concept that courts often recognize as a per se violation, plaintiffs make no argument that GNC engaged in group boycott nor cite a single case in the entire corpus of antitrust law that addresses this type of claim. In sum, it is impossible to conclude from plaintiffs allegations that GNC's alleged conduct was "manifestly anticompetitive," and, thus, per se unreasonable.

Plaintiffs argue that because its alleged Section 1 violations are per se unlawful, no proof of relevant markets is necessary. Plaintiffs are wrong. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F.Supp. 1055, 1060 (E.D. Pa. 1996) ("in order to state a Sherman Act claim under either §1 or §2, a plaintiff must identify the relevant product and geographic market and allege that the defendant exercises market power within those markets"), *aff'd* 124 F.3d at 436 (3d Cir. 1997) ("It is true that in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.  Plaintiffs err, however, when they try to turn this general rule into a per se prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed. R. Civ. P. 12(b)(6)") (citation omitted); *Bogan v. Hodgkins,* 166 F.3d 509, 515 (2d Cir. 1999) ("The categories of per se illegal practices are an approximation, a shortcut to reach conduct that courts can safely assume would surely have an anticompetitive effect. Thus, it is an element of a per se case to describe the relevant market in which we may presume the anticompetitive effect would occur"). Plaintiffs have pled

16

no relevant market, and this Court will dismiss the claim for this reason and additional reasons below.

In addition to failing to state a claim under the per se theory, plaintiffs' claim fails equally under the rule of reason analysis. Under this test, the court "weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988). The first step in applying the rule of reason requires that the plaintiffs demonstrate that a competitive restraint has had substantial adverse, anti-competitive effect. To meet this initial burden, plaintiffs must prove: (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy. *Rossi*, 156 F.3d at 464-465. Plaintiffs may satisfy this burden by proving the existence of actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods or services. *United States v. Brown University*, 5 F.3d 658, 668 (3d Cir. 1993).

Plaintiffs allege horizontal conspiracy between GNC and third-party vendors to supply goods to GNC franchisees and subsidiaries at different prices. Conclusory allegations of conspiracy, however, are insufficient to state a Sherman Act claim. *See Pennsylvania ex Rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 182 (3d. Cir. 1988) ("A general allegation of conspiracy without a statement of facts is an allegation of a legal conclusion and insufficient to constitute a cause of action."); *Garshman v. Universal Resources Holding, Inc.*, 824 F.2d 223, 230 (3d Cir. 1987) (The allegation of unspecified contracts with unnamed other entities to

17

achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act"). Here, plaintiffs name only one alleged conspirator in its pleadings, Optimum Manufacturing (in their Opposition to Defendants' Motion to Dismiss, plaintiffs also mention "Silver Sage," but this appears to be a brand name, not a third-party supplier). Plaintiffs additionally fail to allege how GNC conspired, when, and regarding what products and prices. *See Brunson Communs., Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563 (E.D. Pa. 2002) (dismissing boycott allegation for which "Plaintiff has not provided a single detail as to when, why, or how the conspirators decided upon this alleged boycott. . . . [W]hile Plaintiff's Amended Complaint is extremely broad in charging Section One antitrust liability, it falls far short on the facts."). Plaintiffs herein fall short of the standards for pleading a claim under Section 1.

The second step in plaintiffs' case, proving that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets, requires that they adequately define the relevant product and geographic markets. Again, plaintiffs have pleaded no relevant market. The pleading requirements for the antitrust plaintiff are strictly applied. "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza*, 124 F.3d at 436.

Accordingly, plaintiffs' Sherman Act claim will be dismissed, without prejudice, for failure to plead a market, claim a per se violation, or satisfy either prong of the rule of reason test.

**Count XII: Breach of Fiduciary Duty**

Plaintiffs assert that GNC has a fiduciary relationship with its franchisees and that GNC breached its fiduciary relationship with the Bishops through the predatory marketing and pricing actions alleged in the complaint. The United States District Court for the Eastern District of Pennsylvania has determined that no fiduciary relationship exists between franchisor and franchisee under Pennsylvania law. *See, e.g., MAACO Enters, Inc. v. Cross*, 1992 WL 350667, at *2 (E.D. Pa. 1992) (dismissing breach of fiduciary duty because there is no such duty between franchisor and franchisee); *Tilli v. AAMCO Transmissions, Inc.*, 1992 WL 38405, at *3 (E.D. Pa. 1992) (same); *AAMCO Transmissions, Inc. v. Harris*, 759 F. Supp. 1141, 1147 (E.D. Pa. 1991) (holding that a claim for "breach of fiduciary duty . . . must be dismissed because no such duty exists as a matter of law. The courts of this district have concluded in similar cases that a franchise relationship is not fiduciary in nature.").

Additionally, as Judge O'Neill stated in *Coxfam, Inc. v. AAMCO Transmissions, Inc.*, 1990 WL 131064 at 3 (E.D. Pa. 1990), with footnotes omitted: The significant weight of authority holds that franchise agreements do not give rise to fiduciary or confidential relationships between the parties. *See O'Neal v. Burger Chef Systems*, 860 F.2d 1341, 1349-50 (6th Cir. 1988) (applying Tennessee law); *Premier Wine & Spirits v. E. & J. Gallo Winery*, 846 F.2d 537, 540-541 (9th Cir. 1988) (applying South Dakota law); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 484-85 (5th Cir. 1984) (applying Louisiana law); *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 354-56 (7th Cir. 1982) (applying Wisconsin law); *Picture Lake Campground, Inc. v. Holiday Inns, Inc.*, 497 F.Supp. 858, 869 (E.D. Va. 1980) (applying Virginia law); *Layton v. AAMCO Transmissions, Inc.*, 717 F.Supp. 368, 371 (D. Md. 1989)

19

(applying Maryland law); *Bonfield v. AAMCO Transmissions, Inc.*, 708 F.Supp. 867, 883-84 (N.D. Ill. 1989) (applying Illinois law).

As plaintiffs cite no authority supporting their theory that a fiduciary duty exists between franchisor and franchisee, this Court will follow the holdings of the District Court for the Eastern District of Pennsylvania and the Court of Appeals for the Fifth, Sixth, Seventh, and Ninth Circuits in holding that no such duty exists in the franchisor/franchisee relationship, and, therefore, will dismiss this claim with prejudice.


**Count XIII: Conspiracy Under the Robinson-Patman Act**

Plaintiffs claim that GNC conspired to violate the Robinson-Patman Act by selling products to corporate-owned stores for less than it was selling these products to the plaintiffs. In *FTC v. Henry Broch & Co.*, 363 U.S. 166, 174 (1960), the United States Supreme Court held that the Robinson-Patman Act "is aimed at price discrimination, not conspiracy." Relying on the *Broch* decision, a number of courts have declined to recognize an independent cause of action for conspiracy under the Robinson-Patman Act. *See, e.g., General Supply Deck & Floor Underlayment Co. v. Maxxon Southwest*, 2001 WL 1480768, at *4 (N.D. Tex. 2001) (dismissing conspiracy claim because "there is no provision in the Robinson-Patman Act providing for such a claim"); *Drug Mart Pharmacy Corp. v. Am. Home Products Corp.*, 378 F. Supp. 2d 134, 140 (E.D.N.Y. 2005) ("[R]esearch has not revealed a single case in which a conspiracy claim was asserted and allowed in a Robinson-Patman case . . . . The inference, I suggest, is permissible, that the unavailability of such a claim is accepted by the legal and academic community.").

In sum, there exists no authority for allowing a conspiracy claim under the Robinson-Patman Act and plaintiffs do not even argue one. Therefore, the Court will dismiss this claim

with prejudice.

**Count XIV: Punitive Damages**

Finally, plaintiffs set forth punitive damages as a separate claim for relief. Amended Complaint ¶ 127-29. Punitive damages, however, do not constitute an independent cause of action. *See Dittrich v. Seeds*, U.S. Dist. LEXIS 22229, at *15 (E.D. Pa. 2005) ("We note that punitive damages are not an independent cause of action. Rather, punitive damages are a remedy"); *Shorb v. State Farm Mut. Auto. Ins. Co.*, 2005 WL 1137881, at *5 (M.D. Pa. 2005) ("Plaintiffs cannot maintain an independent cause of action for punitive damages."); *Waltman v. Fahnestock & Co., Inc.,* 792 F. Supp. 31, 33 (E.D. Pa. 1992) ("punitive damages are a remedy, not a cause of action"). Therefore, the Court will dismiss plaintiffs' claim for punitive damages claim, with prejudice.

### V. Conclusion

For the reasons discussed above, the Court will not dismiss Count I and will dismiss Counts II, III, IV, V, VI, VIII, IX, X, XII, XIII, and XIV with prejudice and Counts VII and XI without prejudice.  The motion to dismiss will be granted in part and denied in part.

An appropriate order follows.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge

cc: all counsel of record

21

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**HAROLD E. BISHOP,**
**PATRICIA BISHOP**
**and ALTERNATIVE HEALTH INC.**

Plaintiffs,

v.                                                    **05cv0827**

**GNC FRANCHISING LLC, GENERAL**
**NUTRITION CORP., GENERAL**
**NUTRITION DISTRIBUTION CORP.,**
**and APOLLO MANAGEMENT LP**

Defendants.


# ORDER OF COURT

AND NOW, this 1st day of December, 2005, as set forth more fully in the accompanying

memorandum opinion, **IT IS HEREBY ORDERED** that defendants' motion to dismiss

(document no. 9) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Counts II, III, IV, V, VI, VIII, IX, X, XII, XIII, and

XIV are DISMISSED with prejudice and Counts VII and XI are DISMISSED without prejudice.


s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge


cc:      All counsel of record

Jeffrey M. Goldstein, Esquire

22

Goldstein Law Group
818 18th Street, N.W.
Suite 505
Washington, DC 20006

Gordon Schmidt, Esquire
Gary Kellen, Esquire
Gerald J. Stubenhofer, Esquire
McGuire Woods
625 Liberty Avenue
23rd Floor, Dominion Tower
Pittsburgh, PA 15222-3142

Curtis L. Frisbie, Esquire
Randy D. Gordon, Esquire
Samuel E. Joyner, Esquire
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, TX 75201